**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN-N-OUT BURGERS,
a California corporation,

      Plaintiff,

v.                                      Case No. 25-

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS,
IDENTIFIED ON SCHEDULE "A",

      Defendants.

**COMPLAINT**

Plaintiff In-N-Out Burgers ("INO" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations identified on **Schedule A** attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.    This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, et seq., 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to

---

[1] The e-commerce store URLs are listed on Schedule A hereto under the Online Marketplaces.

Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold products using infringing and counterfeit versions of INO's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused INO substantial injury in the State of Illinois.

## II. NATURE OF THE ACTION

3. This action has been filed by INO to combat e-commerce store operators who trade upon INO's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products using infringing and counterfeit versions of INO's federally registered trademarks (the "Counterfeit Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale, and selling Counterfeit Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. INO is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. INO has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

## III. INTRODUCTION

**Plaintiff**

4. INO is a California corporation with its principal place of business in Irvine, California.

5. For more than 75 years, INO has operated a successful and popular chain of quick service restaurants offering made-to-order burger sandwiches and other products and services.

6. INO has over 400 locations in total throughout California, Arizona, Nevada, Utah, Texas, Oregon, Colorado, and Idaho, and it is continuing to expand to other states. INO has announced plans to open its first location east of the Mississippi River in Franklin, Tennessee by 2025.

7. INO serves and has served thousands of out-of-state customers who regularly travel to INO's locations and sells merchandise via its website to all 50 states, such that INO's customers are located throughout the United States, including in Illinois.

8. INO is also well-known through its locations in tourist and other popular areas that are extensively visited by customers from all over the United States (including Illinois), such as Hollywood, California; Fisherman's Wharf in San Francisco, California; Las Vegas, Nevada; and the University of Texas, Austin.

9. INO has developed a highly loyal customer base and has been consistently rated as one of the top quick-service restaurants in several customer satisfaction surveys. The opening of a new restaurant often becomes a popular, highly publicized event. For example, when INO opened its location in Scottsdale, Arizona, there was a four-hour wait for food, and news helicopters covered the event from overhead. Similar fanfare and wait times of up to 14 hours occurred in November 2020 when INO opened two locations in Colorado, a state in which INO had never

previously done business, and were a 500-mile drive from the next-closest INO location. A number of renowned chefs have publicly identified as fans of INO, including Gordon Ramsay, Thomas Keller, Julia Child, Anthony Bourdain, Ina Garten, and Mario Batali.

10. INO's business practices also contribute to the strong goodwill it enjoys and it is guided by a simple business philosophy: "Give customers the freshest, highest quality foods and provide them with friendly service in a sparkling-clean environment." Another key to INO's success is its decision not to franchise its operations or go public, in order to prioritize quality over excessively rapid business growth. INO is also well-known for employee-centered personnel policies. For example, INO is one of the few quick-service restaurant chains in the United States to pay its employees more than state and federally mandated minimum wage guidelines.

11. INO was one of the very few restaurant chains given a positive mention in the book *Fast Food Nation*. The book commended the chain for using natural and fresh ingredients and for looking after the interests of employees regarding pay and benefits.

12. The INO brand has thus been a nationwide success that resonates with all classes of consumers.

13. To further grow the INO brand, INO sells merchandise featuring its federally protected trademarks and trade dress to remind consumers of their experiences at INO restaurants.

14. INO has sold and continues to sell substantial amounts of INO-themed merchandise to consumers everywhere, including Illinois, at its website at shop.in-n-out.com. For example, INO's records show that INO has sold products and merchandise via INO's online store to Illinois residents every year for the past 10 years.

15. Through November 2024 alone, INO's *in-n-out.com* website had over 300,000 visits from consumers in Illinois, with its *shop.in-n-out.com* website garnering 24,000 visits from

4

Illinois consumers. There were over 1,000 transactions made by Illinois customers on INO's shop.in-n-out.com website and nearly 300 direct interactions with such consumers with INO's customer service.

16. Since at least 1949, INO has consistently and exclusively used various IN-N-OUT-formative marks, among others, in in its restaurants, product packaging, and promotional goods like t-shirts, hats, and other clothing to indicate INO as the source of its goods and services.

17. In recognition of the consumer recognition and goodwill associated with INO's trade dress and trademarks, the US Patent and Trademark Office has issued INO several federal trademark registrations for INO's marks (collectively, the "Trademarks"), including but not limited to the following:

| U.S. Reg No. | Mark |
| --- | --- |
| 1031095 | IN-N-OUT BURGER |
| 1085163; 1101628; 1101638; 2217307; 2285823 | IN-N-OUT |
| 1023506; 2026720 | [IN-N-OUT burger arrow logo] |
| 1031096 | [IN-N-OUT BURGER arrow sign logo] |
| 1514689 | [IN-N-OUT BURGER logo with arrow] |

| | | |
|---|---|---|
| 1516560 | | IN·N·OUT (logo with arrow) |
| 1522799 | | IN·N·OUT (logo with arrow) |
| 1528455 | | IN·N·OUT BURGER (logo with arrow) |
| 1525982 | | IN·N·OUT (logo with arrow) |
| 1528456 | | IN·N·OUT BURGER (logo with arrow) |
| 1539451 | | IN·N·OUT BURGER (logo with arrow, black background) |
| 1960015 | | IN·N·OUT BURGER (logo with arrow) |

| | |
|---|---|
| 3367471 | IN-N-OUT BURGER (logo) |
| 4625449; 1165723 | DOUBLE DOUBLE |
| 3572485; 4446247 | DOUBLE-DOUBLE |
| 4446249; 4841694 | ANIMAL STYLE |
| 2614730; 2604277; 2634516 | QUALITY YOU CAN TASTE |
| 6390924 | QUALITY YOU CAN WEAR |
| 1507389 | (palm trees design) |
| 6208865; 6664174; 6664193; 6058727 | (crossed palm trees design) |
| 1935301 | (palm trees design) |

18. The above U.S. registrations for INO's Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the Trademarks constitute *prima facie* evidence of their validity and of INO's exclusive right to use the Trademarks pursuant to 15 U.S.C. § 1057(b). Incontestable status under 15 U.S.C. § 1065 provides that the registrations for the Trademarks are conclusive evidence of the validity of INO's Trademarks and of the registrations of the Trademarks, of INO's ownership of the Trademarks, and of INO's exclusive right to use the Trademarks in commerce. 15 U.S.C. §§ 1115(b), 1065.

True and correct copies of the United States Registration Certificates for the above-listed Trademarks are attached hereto as **<u>Exhibit 1.</u>**

19. The Trademarks are distinctive when applied to INO's goods and services, signifying to the purchaser that the products come from INO and are made to INO's quality standards. INO ensures that goods and services bearing the INO Trademarks are of the highest quality standards.

20. INO's Trademarks are famous marks as that term is used in 15 U.S.C. § 1125(c)(1). The innovative marketing and product designs of the INO's goods have enabled the INO brand to achieve widespread recognition and fame. The widespread fame, outstanding reputation, and significant goodwill associated with the INO brand have made INO's Trademarks valuable assets of INO.

21. INO's goods are distributed and sold directly to consumers throughout the United States, including in Illinois.

**The Defendants**

22. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to INO. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement systems, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

23. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics

used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for INO to discover Defendants' true identities and the exact interworking of their network. If Defendants provide additional credible information regarding their identities, INO will take appropriate steps to amend the Complaint.

## IV. DEFENDANT'S UNLAWFUL CONDUCT

24. INO's success as a brand has resulted in significant counterfeiting of INO's Trademarks. Recently, INO has identified many fully interactive, e-commerce stores offering Counterfeit Products on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Walmart, Wish.com, Etsy, DHgate, and Temu, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a U.S. Customs and Border Protection (CBP) report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights (IPR) violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. Intellectual Property Rights Seizure Statistics, Fiscal Year 2021, U.S. Customs and Border Protection (**Exhibit 2**). Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), most of which originated from China and Hong Kong. *Id.*

25. Other reports, such as *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates, have made similar findings (**Exhibit 3**).

26. Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 4**, Daniel C.K. Chow, Alibaba, Amazon, and Counterfeiting in the Age of the

Internet, 40 NW.J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 5** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. *Id.* at 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. *Id.* at 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 4** at 186-187. Specifically, brand owners have no choice but to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order." *Id.* at 161.

27. The very same concerns regarding anonymity, multi-storefront infringers, and slow and ineffective notice and takedown marketplace procedures impact Plaintiff's enforcement efforts when trying to assert its own trademark rights.

28. Defendants have targeted sales to Illinois residents by setting up and operating ecommerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents of Illinois.

29. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores (including product detail pages) operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases look sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. Ecommerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. INO has not licensed or authorized Defendants to use any of the INO Trademarks, and none of the Defendants are authorized retailers of any of INO's goods or services.

30. Many Defendants also deceive unknowing consumers by using INO's Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for INO's goods. Other e-commerce stores operating under the Seller Aliases omit using the INO Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for INO goods.

31. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

32. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like

Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

33. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other seller aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features, such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

34. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

35. Counterfeiters such as Defendants typically operate under multiple seller aliases and operate multiple credit cards, merchant and Amazon accounts behind layers of payment gateways so that they can continue to operate in spite of INO's enforcement efforts. Ecommerce store operators like Defendants also maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to INO. Indeed, analysis of financial account

transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

36. Upon information and belief, Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from INO, have jointly and severally, knowingly and willfully used and continue to use INO's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

37. Defendants' unauthorized use of INO's Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming INO.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING

38. INO hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from goods and services offered, sold, or marketed under INO's Trademarks.

40. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of INO's Trademarks without INO's permission.

41. INO is the exclusive owner of the Trademarks. INO's United States Registrations for the Trademarks (**Exhibit 1**) are in full force and effect. On information and belief, Defendants have knowledge of INO's rights in the Trademarks and are willfully infringing and intentionally using counterfeit versions of the Trademarks. Defendants' willful, intentional, and unauthorized use of the Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

42. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

43. INO has no adequate remedy at law and, if Defendants' actions are not enjoined, INO will continue to suffer irreparable harm to its reputation and the goodwill of the Trademarks.

44. The injuries and damages sustained by INO have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

45. INO hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

46. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with INO or the origin, sponsorship, or approval of Defendants' Counterfeit Products by INO.

47. By using the Trademarks in connection with the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

48. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

49. INO has no adequate remedy at law and, if Defendants' actions are not enjoined, INO will continue to suffer irreparable harm to its reputation and the goodwill of the INO brand.

## PRAYER FOR RELIEF

WHEREFORE, INO prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a) using the Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine INO product or is not authorized by INO to be sold in connection with the Trademarks;

   b) passing off, inducing, or enabling others to sell or pass off any product as a genuine INO product or any other product produced by INO, that is not INO's or not produced under the authorization, control, or supervision of INO and approved by INO for sale under INO's Trademarks;

c) committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of INO, or are sponsored by, approved by, or otherwise connected with INO;

d) further infringing INO's Trademarks and damaging INO's goodwill; and

e) manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for INO, nor authorized by INO to be sold or offered for sale, and which bear any of INO's trademarks, including the Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, upon INO's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Walmart, Wish.com, Etsy, Temu, and DHgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements or storefronts used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using INO's Trademarks;

3) That Defendants account for and pay to INO all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that INO be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of INO's Trademarks;

5) That INO be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

|  |  |  |
|---|---|---|
|  |  | Respectfully submitted, |
| Dated: April 30, 2025 | By: | /s/ Brian D. Wassom |
|  |  | Brian D. Wassom (P60381)<br>WARNER NORCROSS + JUDD LLP<br>12900 Hall Road, Suite 200<br>Sterling Heights, Michigan 48313<br>(586) 303-4139<br>Attorneys for Plaintiff<br>bwassom@wnj.com |